1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TYLER ADAM DICKSON,

11            Petitioner,                    2: 10 - cv - 355 - GEB TJB

12        vs.

13   LARRY SMALL,

14            Respondent.                    ORDER, FINDINGS AND

15                                           RECOMMENDATIONS

16   _____/

17        Petitioner, Tyler Adam Dickson, is a state prisoner proceeding with a counseled petition

18   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence

19   of twenty-six years to life imprisonment after a jury convicted him of first-degree murder along

20   with special circumstances.  Petitioner raises two claims in this federal habeas petition;

21   specifically:  (1) the prosecutor had actual knowledge of, and possessed Brady material

22   concerning a prosecution witness that was withheld from the defense ("Claim I"); and (2) the

23   sentence was unconstitutionally disproportionate based on the nature of the offense and the

24   nature of Petitioner ("Claim II").  For the foregoing reasons, the federal habeas petition should be

25   denied.

26

1

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

Prosecution

1. William Wellman

William Wellman testified for the prosecution against defendants [Sean] O'Brien and Dickson pursuant to a plea bargain. Under the terms of that agreement, Wellman agreed to testify truthfully and to plead guilty to first degree murder. The agreement was conditioned on the understanding that if the trial court determined that Wellman testified truthfully, the court would reduce Wellman's conviction to second degree murder, and the district attorney's office would recommend that Wellman be released when he was eligible for parole.

At the time of their crimes, Wellman was 20 years old, Dickson was 17; and O'Brien was 16. Wellman had been friends with Dickson for about two and a half years. They both enjoyed riding BMX bikes together. Dickson told Wellman they were going to go to a home where some people a little older than they lived, and they would steal some dirt bikes and marijuana. To carry out the plan, Wellman slept over at Dickson's house on February 25, 2003. Wellman woke up the morning of February 26, 2003, at roughly 7:00 a.m. Their plan was for Dickson to go to school that morning, then meet Wellman at a video store located at the top of Oak Hill Road. Wellman drove to the store and waited until Dickson showed up. [FN 1] By the time Dickson arrived, Wellman's truck had run out of gas, so they rode in Dickson's truck and went to the house of a friend, Shawn Santelio. They stayed there for about 20 minutes, and then they drove to defendant O'Brien's house. [FN 2]

[FN 1] An Independence High School administrator stated that school started at 7:55 a.m. Records for February 26, 2003, indicated Dickson was present at the beginning of school, but he reported to the office complaining of feeling ill. A call was made at 8:08 a.m. to his home to contact a parent, but it was unsuccessful. Dickson then checked himself out of school.

[FN 2] Shawn Santelio was a good friend of Dickson's and an acquaintance of Wellman's. Santelio testified that in late February 2003, Dickson and Wellman stopped by his house in the morning and asked if he wanted "to go jack some dirt bikes." He said no. He did not remember if they came over more than once that day.

Wellman had never met O'Brien prior to this time. He and Dickson stayed at O'Brien's house for about 30 to 40 minutes,

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from August 2008 and filed in this Court by Respondent on August 16, 2010 as Exhibit A to his answer (hereinafter referred to as the "Slip Op.").

talking about what was going to happen.  [FN 3]  O'Brien explained he thought no one would be in the home they were going to burgle.  He said they would find money, marijuana, and dirt bikes there.  Dickson had not known what the plan was until they discussed it with O'Brien.

[FN 3]  Wellman was not wearing a watch that day and had no place to be, so he "wasn't really keeping track of time."  On cross-examination, he said they stayed at O'Brien's house "ten minutes at most."

These discussions took place in O'Brien's bedroom.  Wellman noticed there was an aquarium in the room that contained exotic fish such as piranhas.  He also noticed a couch or love seat in the room. [FN 4]

[FN 4]  Wellman did not know when they arrived at O'Brien's house except that it was sometime after 8:00 a.m. they had arrived.

From O'Brien's house, the trio proceeded to the Big Horn Gun Shop located on Forni Road, a trip of about five minutes.  They rode in Dickson's truck, with Dickson driving.  O'Brien brought along a shotgun he had wrapped in a blanket.  O'Brien asked Wellman if he would buy shotgun shells, since Wellman was the only person over 18 years old.

The three went inside the gun store, and Wellman asked the clerk for some shotgun shells.  He did not know what type of shells to get, so O'Brien told the clerk what they needed.  The box of shells did not cost more than five dollars.  The trio was inside the store no more than five minutes.

From the gun shop, the young men drove to a home located on Treasure Lane, off of Green Valley Road.  Dickson drove, and O'Brien gave Dickson directions.  O'Brien stated they were going to go inside when they got to the house.  He also said that if anyone was there, he was going to blow them away.

Dickson pulled into the home's driveway, and he parked the truck with the front end facing the house.  A white Toyota pickup was parked in the driveway.  The three got out of the truck.  O'Brien proceeded to the front door.  He knocked twice, but no one answered.  He walked back to the truck and said, "I don't think anybody is home, anybody is here."  He grabbed the shotgun, and all three of the men went to the door.

The front door was open.  As they walked inside, a man came out of a side bedroom holding a rifle.  The man asked, "What are you doing in my house?"  Wellman and Dickson quickly turned around, exited the house, and ran back to the truck.  Dickson started the truck up, and as he was doing that, Wellman heard a gunshot from inside the house.

Dickson had put the truck into reverse and had started backing up when O'Brien came out of the house, waving and yelling, "He's dead." Dickson drove the truck back towards the house and got out. He left the truck running, and he told Wellman to turn the truck around. Wellman complied and then went inside the house.

Inside, Wellman saw the victim lying on the floor. Dickson was standing and holding the victim's rifle, and O'Brien was standing and holding the shotgun. Wellman grabbed a marijuana pipe from a table in the living room and put it in his pocket. He then saw Dickson and O'Brien standing in front of a door down the hallway. O'Brien said, "This is the room we want to get into." This was not the same room the victim had come out of. Wellman joined the other two. Dickson kicked open the door, and Wellman and O'Brien went into the room.

Wellman grabbed some marijuana from inside a dresser, and O'Brien took "a lot" of cash from inside a box in the dresser. Dickson then reappeared at the door, and Wellman said, "We should get out of here." The three left the house.

Once inside the truck, they put the victim's rifle and the shotgun under the seat. O'Brien took the cash out of his pocket. He tried to count it but "there was so much adrenaline" that he could not concentrate. He gave about $200 to Wellman.

While driving away on Forni Road, one of the boys suggested they get rid of the victim's rifle. Wellman told them there was a pond coming up. They stopped at the pond. O'Brien got out and threw the rifle into the water.

They then drove back to O'Brien's house. They smoked the marijuana Wellman had stolen. They agreed that they would not talk about what had happened again. After about 20 minutes, Wellman and Dickson left and went to Shawn Santelio's house. On the way there, Dickson told Wellman he was sorry for getting him into this. [FN 5]

[FN 5] On cross-examination, Wellman stated he had no idea what time the three men arrived back at O'Brien's house after throwing away the rifle in the pond, but if he had to say, it was probably around 11:00 a.m. This differed from the time frames Wellman gave to investigating authorities in his first two interviews with them. In those interviews, Wellman stated that Dickson picked him up at Independence High School that morning sometime between 10:00 a.m. and 11:00 a.m., and that they threw the rifle into the pond sometimes between 1:30 p.m. and 2:00 p.m. The jury saw a videotape of the first interview and heard an audiotape of the second interview.

//
//
//

4

1

2.  Jesse Pine

2

3

4

5

6

7

Jesse Pine resided at the Treasure Lane home in February 2003.
The house had two levels, a main level and then a basement.  The
garage was in the basement level.  Three dirt bikes, one street
motorcycle, and a few jet skis were stored in the garage.  Pine lived
at the Treasure Lane home with Tim Dreher, Eric Rootness, and
Kyle Smelser.  Pine's and Smelser's bedrooms were located on the
main floor across the hall from each other.  Smelser's bedroom
windows looked out the front door of the house towards the
driveway and the stairway leading to the house.  Smelser owned an
off-white Toyota pickup.

8

9

10

11

At that time, Pine used marijuana, and he sold it to his roommates
and friends.  One person to whom he sold the drug on occasion was
Rootness's stepbrother, Frankie Silici.  Silici would come to the
Treasure Lane house to purchase marijuana.  Oftentimes, Silici
would bring a friend or two with him.  One of the friends he
brought to the house was defendant O'Brien.  Pine did not know
Wellman or Dickson, and he had no knowledge that either of them
had ever visited his house.

12

13

14

15

Pine left the house for work on February 26, 2003, at around 6:40
a.m.  He locked his bedroom door before leaving.  Smelser's truck
was parked in the driveway when he left.  Pine returned home from
work at about 3:50 p.m. that day.  Smelser's truck was still parked
in the same location.  Pine was surprised to find the home's front
door wide open.

16

17

18

19

20

Upon walking in the house, Pine saw Smelser lying on the floor.
He ran over and discovered that Smelser had been shot.  He began
running around the house, looking for anyone and anything.  In
Smelser's bedroom, he saw an empty gun case on the bed.  He
noticed the door to his own bedroom had been kicked open. $3,000
in cash was missing from inside his dresser drawer.  A large
amount of marijuana that he stored in his backpack was still in his
room, but his marijuana pipe that he kept on a table in the living
room was missing.  Pine called 911.

21

3.  The investigation

22

23

24

Deputy Jim Applegate from the El Dorado Sheriff's Department
was the first law enforcement officer to arrive at the scene.  He
found the victim lying on the floor with a gunshot would to the left
side of his head.  The body was cool to the touch.  Applegate
noticed the beginning of lividity, or pooling of the blood, in the
victim's fingers.

25

26

At approximately 6:00 p.m. on February 26, 2003, forensic
pathologist Curtis Rollins, M.D., arrived at the crime scene and
examined the victim's body.  He concluded the victim had died

5

from a shotgun wound to the head.  Death had occurred approximately six to eight hours prior, or between 10:30 a.m. and 12:30 p.m. that day, and more likely closer to 12:30 p.m.  He also concluded the distance between the end of the firing gun's barrel and the victim was between three and four feet.

During the autopsy, Dr. Rollins recovered a plastic shot cup or shot-wad from the wound.  He explained the shot-wad is a component of the shotgun shell that is used to hold the pellets together until it opens and lets the pellets out.  Dr. Rollins also recovered numerous bird shot pellets.

Detective Paul Moschini of the El Dorado County Sheriff's Department interviewed defendant Dickson on March 4, 2003.  Dickson had requested the interview.  In this interview, Dickson did not admit to any personal involvement in the killing.  Moschini interviewed Dickson a second time on March 7, 2003.  At that time, Dickson admitted to going to the Treasure Lane house where Smelser was murdered.  Dickson said he went there to "rip off" dirt bikes, money, and marijuana.  He drove his own truck to the house.  He had never been to the house before.

Dickson told Moschini that when he arrived at the house, a white Toyota pickup truck was parked in the driveway.  Dickson stated that after he entered the house, a man came out of a room wearing a dark pair of pants but no shirt.  He was carrying a .22 rifle.  The man said, "What the fuck are you doing here?"  Thinking there was going to be a gunfight, Dickson ran out of the house.  After leaving the house, Dickson said, he went to a pond located on Forni Road for the purpose of throwing away the .22 rifle.

Dickson informed Moschini that Wellman was with him when this happened.  Dickson had called Wellman and asked him to come along for reassurance because he did not want anything to go wrong.  Dickson showed Moschini the location from where the rifle was thrown into the pond.  After Dickson showed Moschini the pond, he took the detective to Wellman.  Moschini arrested Wellman.

Deputy sheriffs searched the pond off Forni Road to locate the gun.  The divers located the rifle in six feet of water about 17 feet off the shore and near a turnout from the road.  The weapon was a Winchester .22 caliber long rifle.  It was not loaded.

4.  J.D. Petty

Jonathan or "J.D." Petty was a friend of O'Brien's from when the two attended Union Mine High School.  They would hang out together all day.  Petty also was an acquaintance of Dickson's from school, but he did not know Dickson very well.  In February 2003, Petty loaned O'Brien a .20 gauge shotgun.  He thought it was either

6

a Winchester or a Remington.

The day before he loaned the gun to O'Brien, Petty had been at O'Brien's house. O'Brien had a box of clay pigeons in his room. He told Petty that he and a couple of his cousins were going trapshooting the next day and they were short one gun. He asked Petty if he could borrow his gun. Petty agreed to drop it off the next day on his way to school.

Petty gave the gun to O'Brien the next morning. Petty called O'Brien from his cell phone at 7:55 a.m. on February 26 when he arrived at O'Brien's driveway. After Petty pulled up to the house, O'Brien came out and got the gun. The gun was wrapped in blankets or beach towels. Dried mud was caked on the butt of the stock from when Petty had used the gun for duck hunting.

At 11:25 a.m. that same day, O'Brien called Petty and left Petty a message to call back. Petty did so at 11:28 a.m. O'Brien told Petty he could pick up the shotgun. Petty went to O'Brien's house after school to retrieve the gun. Two friends of his, Clifton Sargent and Michael Carrick, were there when he arrived. O'Brien gave Petty the gun and the towels separately. The gun appeared to have been wiped down. There was no mud on the stock. [FN 6]
[FN 6] The Independence High School administrator confirmed that Petty attended school on February 26 from 7:55 a.m., the time school started, until 2:00 p.m.

O'Brien also gave Petty a box of Winchester .20 gauge shotgun shells. The box's price tag indicated it had been purchased at the Big Horn Gun Shop. One shell was missing from the box. Petty asked O'Brien about the missing shell. O'Brien said he had shot it into a hillside to see what it would do. This explanation did not seem right to Petty because of the way O'Brien had spoken about going trapshooting with his cousins. He thought O'Brien would know what a shotgun would do if he shot it into a hill.

Over the next few days, Petty heard of the killing, and he began hearing rumors that O'Brien was the person who did it. He connected these rumors with the fact that one shell was missing from the box of ammunition O'Brien gave him, and, with his friends Sargent and Carrick, "kind of put things together." Worried that he possessed the murder weapon, Petty, along with Sargent and Carrick, went to a relative's property, smashed the shotgun on a rock, and threw the broken pieces into a ravine. They also threw the ammunition and its box into the ravine.

Later, Petty showed Detective Paul Moschini where he had disposed of the gun, and he assisted the detective in searching the area. Moschini recovered parts of the shotgun, 13 shotgun shells, and a gray Winchester shotgun shell box that had a price tag of $4.99 from Big Horn Gun Shop. [FN 7]

7

[FN 7] Terry Fickies, a criminalist for the state Attorney General, compared the shot-wad and the pellets recovered from the victim by pathologist Dr. Rollins to one of the recovered unfired Winchester shotgun shells.  Fickies determined the wadding was consistent in color, composition, and design to the wadding from the unfired shell.  He also concluded the pellets recovered from the victim were consistent with the pellets from the live round.

5. Frankie Silici

Frankie Silici, Eric Rootness's stepbrother, was a friend of O'Brien's.  In early 2003, they were hanging out together nearly every day.  Silici testified that prior to February 2003, he had taken O'Brien to the Treasure Lane home on two occasions.  On both occasions, he purchased marijuana from Pine.  He also took O'Brien down into the home's garage to see Rootness's new motorcycle.

On February 26, 2003, Silici called O'Brien's home telephone number at 10:11 a.m. from his cell phone.  O'Brien did not have a cell phone at that time of which Silici was aware.  Silici did not testify as to the contents of this first phone call or whether he actually reached O'Brien.  O'Brien called Silici's cell phone that same day at 11:45 a.m. and left a message indicating he did not have any marijuana.  O'Brien called Silici again at 12:17 p.m. indicating he now had marijuana.

6. Chantell Michaud

Chantell Michaud was a close friend of O'Brien's.  She would speak with him on the phone a few times a week.  On February 26, 2003, she called O'Brien at his home at about 10:30 a.m. and spoke with him.  O'Brien told her he was going to get some marijuana, money and dirt bikes that day.  He said the place where he would get these things had roommates but he did not think they would be home.  He told Michaud he was leaving after their phone call.

Michaud spoke with O'Brien that evening at about 6:00 or 7:00 p.m.  She asked him if everything had gone okay.  O'Brien said, "No, it didn't go okay."  He told her he did not want to talk about it over the phone.

Later that evening, Michaud saw a report of Smelser's murder on the television news.  The next day, she called O'Brien and tried to discuss the news report with him.  He acknowledged he had seen the news report.  She asked him if that was what went wrong the day before.  He did not answer her.  In an interview prior to trial and shortly after the crime, Michaud told sheriff's detectives that O'Brien had actually answered her question.  When she asked if the murder was what went wrong, O'Brien said, "Yeah."  "Pretty

8

much."

### 7. Richard Anschutz

Richard Anschutz was a close friend of O'Brien's. O'Brien called Anschutz at 11:31 a.m., February 26, 2003, and left a message. Anschutz returned the call at 11:34 a.m. During that conversation, O'Brien told Anschutz he had $2,500 and wanted to purchase some marijuana. Anschutz asked O'Brien where he got the money. O'Brien said, "I don't want to tell you over the phone."

Anschutz and O'Brien spoke again with each other at 12:06 p.m., 12:11 p.m., and 6:00 p.m. that day. All of these calls concerned Anschutz's efforts to find someone to sell O'Brien some marijuana. During either the 6:00 p.m. call or another call two days later, O'Brien informed Anschutz that he no longer needed marijuana.

### 8. Richard Lacerte

Richard Lacerte was another good friend of O'Brien's. Their families socialized and traveled together. O'Brien called Lacerte at 11:32 a.m. on February 26, 2003. Lacerte returned the call at 11:47 a.m. to O'Brien's home. Telephone records for that same date show Lacerte called O'Brien at 5:37 p.m. and O'Brien called Lacerte at 9:30 p.m. During one of those conversations, O'Brien told Lacerte that he had a "couple grand" and was going to purchase some marijuana. He did not explain how he obtained the money, nor did he ask Lacerte if he knew where he could buy the drugs. Also during one of those calls, O'Brien explained that his mother had found his marijuana pipes, and she was going to send him to school in Oregon.

### 9. Amanda O'Brien

Amanda O'Brien is defendant O'Brien's sister. She and O'Brien had originally planned for her to stop by O'Brien's house on February 26, 2003, at 1:30 p.m. so that O'Brien could install a stereo in her car. At 11:47 a.m. on that same day, O'Brien called Amanda and asked her to come by earlier. She and her daughter arrived at the house sometime between 12:15 p.m. and 12:30 p.m. that afternoon.

When she arrived, O'Brien was on the front porch smoking marijuana with Clifton Sargent, Michael Carrick, and Treva Fudge. She had not met any of these people before that day. A few minutes after she arrived, Carrick took Fudge back to school. At around 1:00 p.m., they ordered pizza from Round Table Pizza. Carrick left to pick up the pizza at approximately 1:15 p.m., and returned some 45 minutes later, an unusually long time to make that trip. Amanda left the house around 2:30 p.m.

9

10.  Clifton Sargent

Clifton Sargent was a friend of O'Brien's through J.D. Petty, and he was an acquaintance of Dickson's from school.  He was also Michael Carrick's cousin.  [FN 8]  On February 26, 2003, Sargent went to O'Brien's house around noon.  Carrick was there, as was O'Brien's sister Amanda, and a small child.  At one point, O'Brien took Sargent aside and showed him a "wad of cash."  Sargent asked O'Brien where he got it.  O'Brien said he killed someone for it.  Sargent thought O'Brien was joking and he laughed.  Sargent did not tell Petty or Carrick about O'Brien's comment because he did not believe it.

[FN 8]  At trial, Carrick asserted his Fifth Amendment privilege and did not testify.

Sargent stayed at O'Brien's house for a couple of hours.  He watched O'Brien install a stereo into Amanda's car.  They ordered a pizza and hung out.  Sargent also saw O'Brien give a shotgun and a box of ammunition to J.D. Petty.  He thought this occurred around the day of the car stereo installation or within the next couple of days.  Sargent confirmed that he, Petty and Carrick destroyed Petty's shotgun.

Sargent, O'Brien, and Carrick contacted someone that afternoon about purchasing some marijuana.  That same day or shortly thereafter, the trio met Nate McKelvie, an acquaintance of Carrick's, to purchase marijuana.  O'Brien had the money for that transaction, and Sargent was "pretty sure" it was the same money O'Brien had showed him before.  At some point, O'Brien had told Sargent he wanted to use the money to buy marijuana.

Sargent was interviewed by detectives twice.  He lied during the first interview, but met with detectives a second time the same day.  During the second interview, Sargent stated that O'Brien had in fact told him how much cash was in the wad of money; a little less than $2,400.

In that same interview, Sargent relayed a conversation he had had with O'Brien, where O'Brien told him he planned to go to a house to get marijuana at a time when no one would be home.  O'Brien also told Sargent that the guy was not supposed to be there.  When O'Brien went inside the house, the man came out with a .22 rifle.  It was a standoff, and O'Brien said he fired first because he was standing there with a gun being pointed at him.

11.  Carl Christoffersen

Carl Christoffersen was working at Big Horn Gun Shop in February 2003.  He testified that the store opened on weekday mornings at 10:00 a.m.  He recalled selling a box of shotgun shells in February 2003 to a tall young man who was accompanied by

two younger and shorter men.  They were the first customers in the store that day, right after the store opened.

Detective Tom Hoagland of El Dorado County Sheriff's Department testified that he showed Christoffersen photos of O'Brien, Dickson, and Wellman in March 2003.  Christoffersen identified Wellman as possibly the tall young man to whom he had sold the box of shotgun shells.

12.  Experimental evidence

Detective Hoagland also testified that, based on information he obtained from the investigation, he attempted to determine how long it would have taken for O'Brien, Dickson, and Wellman to make the round trip from O'Brien's house to the Treasure Lane home and back to O'Brien's.  He drove from O'Brien's house to the Big Horn Gun Shop, where he allowed time for purchasing the ammunition to occur.  Then he drove to the Treasure Lane house, and he allowed five minutes for the murder and robbery to occur.  From there, he drove down Forni Road and stopped for five seconds to simulate the throwing of the rifle into the pond.  He then drove back to O'Brien's house.  Hoagland performed these drives around 10:00 or 10:15 a.m.  He drove four different routes for reaching these places in order.  The times for each route were 36 minutes, 39 minutes, 40 minutes, and 47 minutes, respectively.

O'Brien's Defense

O'Brien testified on his own behalf.  He claimed he awoke on February 26, 2003, at 10:15 a.m. when Frankie Silici called him.  After showering, he called Chantell Michaud around 10:30 a.m.  He called her to make arrangements to see her that day or the next day because she was going into Juvenile Hall soon.  They spoke for two or three minutes.

O'Brien did things around the house until 10:45 a.m., when he called Silici back.  He left a message that he was going to be home that afternoon.  [FN 9]  Earlier, he had informed Silici that he would be at his mother's automobile shop that afternoon installing his sister's car stereo, but his plans had changed.  He then started getting things ready for stereo installation.
[FN 9]  O'Brien's testimony was the only evidence of a phone call by him to Silici at 10:45 a.m.  Silici's cell phone bill showed that no calls were made to or from Silici's cell phone on February 26, 2003, between 10:11 a.m. and 11:45 a.m.

Sometime during the morning, O'Brien had called Michael Carrick.  Carrick called him back at around 11:15 a.m.  Carrick was going to come over, hang out, and smoke some marijuana.  A little before 11:30 a.m., O'Brien called Richard Anshutz, and left him a message to call him back.  Then he called Richard

Lacerte to see if he knew where Anschutz was.  After that call, Anschutz called O'Brien back at about 11:35 a.m.

Around 11:45 a.m, O'Brien called Silici again to inform him he had no marijuana and that Silici should not come over after school as he was planning to do.  Then O'Brien called his sister, Amanda, to tell her to come over earlier because he was going to be home and not doing anything.

He called Lacerte again and told him he was trying to get some marijuana.  He explained that he had some money from selling pot on prior occasions, and that Carrick was also supplying some money.

At around 11:45 a.m., Clifton Sargent arrived at O'Brien's house. Five minutes later, Carrick and Treva Fudge arrived.  They came over to hang out and because Carrick had some money to put towards buying marijuana.

At around 12:15 p.m., O'Brien called Silici again.  He told him that he did have some marijuana now.  Carrick and Sargent both had brought some with them.

By 12:30 p.m., Amanda had arrived with her daughter.  O'Brien, Sargent, Carrick, and Fudge were on the front porch smoking marijuana when Amanda arrived.  Shortly afterward, Carrick took Fudge back to school, and O'Brien began installing the stereo in Amanda's car.  The installation took about an hour and a half to two hours.  Afterward, the group ate pizza, and then Amanda left. O'Brien, Sargent, and Carrick then went to Sargent's house. There, Sargent contacted his cousin, Nate McKelvie, to purchase marijuana.  [FN 10]  They ended up purchasing $2,000 worth. Carrick supplied $1,200 and O'Brien supplied $800.  O'Brien had obtained the money from selling marijuana.  [FN 11]  He also had obtained money by withdrawing cash from his mother's bank account.  On four occasions during February, O'Brien had taken his mother's ATM card without her permission and used it to get a total of $1,400 from her account.

[FN 10]  McKelvie was called as a defense witness, but he asserted his Fifth Amendment privilege and did not testify.

[FN 11]  Anthony Campana had known O'Brien for six years.  He purchased marijuana from O'Brien over a period of three months that ended about two weeks before the killing.  He thought he may have bought marijuana from O'Brien 15 times, each time buying a $20-bag.

Carrick made contact with McKelvie at around 3:30 p.m. that afternoon.  O'Brien, Sargent, and Carrick met McKelvie in El Dorado Hills, and then met up with McKelvie's dealer at about 5:00 p.m.  They purchased about a half-pound of marijuana.  They drove back home and divided up the marijuana.  The three then

went out and played pool.  At about 8:00 p.m., Carrick and Sargent dropped O'Brien off at his home.

Two days later, O'Brien was taken to Oregon to attend a boarding school where he could rehabilitate from his marijuana addiction. He was attending this school when he was arrested.

O'Brien admitted that he and Silici had gone to the Treasure Lane house around three times to purchase marijuana from Silici's stepbrother, Eric Rootness.  O'Brien did not buy the drug from Jesse Pine.  Rather, he would give the money to Silici, who gave the money to Rootness, who then gave Silici the drugs.  O'Brien said he did not know Pine sold marijuana or kept a large sum of cash in his bedroom.  [FN 12]
[FN 12]  Eric Rootness confirmed this method of handling the drug purchases.  After Silici gave him money, Rootness gave the money to Pine, who then gave Rootness the drugs to give to Silici. Rootness had seen O'Brien and Silici at the Treasure Lane house three or four times.  Rootness saw O'Brien at least once use the hallway that led to the bedrooms in order to get to the bathroom.

O'Brien denied asking Petty for a shotgun during the last week of February 2003.  He admitted knowing defendant Dickson, but he said they never socialized or hung out together.  He did not know William Wellman.  O'Brien denied the statements ascribed to him by Chantell Michaud.  He denied driving to the Treasure Lane home on February 26, 2003, and he denied killing the victim.

On cross-examination, O'Brien admitted that he did not tell the police when they met with him on March 1, 2003, many of the details he recited in his trial testimony.  He claimed his memory of the events was now better at trial than it was three days after February 26 because he had been thinking about the case.

The defense recalled Detective Hoagland as a witness.  Hoagland had been present during three law enforcement interviews of William Wellman.  The first two were recorded, the third was not as it was just for trial preparation.  During the third interview, however, Wellman provided some new facts.  He revealed that he felt the time frame for the events was different from what he said in the first two interviews.  Wellman also discussed the interior of O'Brien's home, and he mentioned for the first time the existence of a fish tank.

Dickson's Defense

Defendant Dickson also testified on his own behalf.  He attended Independence High School daily from 8:00 a.m. until about 1:00 p.m. and then he went to his job.  He met William Wellman his freshman year.  They spent time riding BMX bikes and four-wheeling in Dickson's truck.  He was also friends with Michael

13

Carrick.

A few days before February 26, 2003, Carrick called Dickson.
They chatted for a few minutes, and then Carrick handed the phone
to O'Brien. Dickson did not know O'Brien well. He had seen him
hanging out with Carrick, Clifton Sargent, and J.D. Petty. O'Brien
asked Dickson what he was doing on Wednesday [the 26th] and if
he could borrow Dickson's truck. Dickson said he needed his
truck for work. Dickson had also planned to skip school that
morning and take Wellman four-wheeling. Dickson agreed to drop
O'Brien off at a friend's house. O'Brien had said he had purchased
a dirt bike and was going there to pick up some marijuana and
money. O'Brien gave Dickson instructions on how to get to his
house.

Tuesday evening, Wellman stayed over at Dickson's house so they
could leave in the morning to go four-wheeling. Dickson told
Wellman that before they left, he had to drop a friend of Carrick's
off at his buddy's house.

Wednesday morning, both boys drove their trucks to the Lions Hall
parking lot. Dickson walked to his school, while Wellman waited
in his truck. Dickson checked himself out of school after only a
few minutes, lying to the office staff that he was sick. He went
back to the parking lot. He and Wellman got in Dickson's truck,
and they drove into Placerville for some donuts and hot chocolate.
Then they drove to O'Brien's house. Dickson could not recall
what time they arrived.

Dickson introduced Wellman to O'Brien. O'Brien showed the
boys to his own truck, and then they went inside the house to
O'Brien's room. Dickson describe the room as having a fish tank,
a truck seat and a little end couch. There was some conversation
about O'Brien's fish. Wellman picked up a clay pigeon and talked
with O'Brien about shooting. At one point, O'Brien asked if it
would be all right to return his brother's shotgun. Dickson saw no
problem with that. O'Brien also asked if they could stop by the
Big Horn Gun Shop.

The three left in Dickson's truck. Dickson thought they had spent
five or 10 minutes at O'Brien's house. Dickson noticed O'Brien
had placed something on the floorboards that was wrapped in a
blanket, but he did not know at that time what it was.

They drove to Big Horn Gun Shop. All three went inside and
looked around for a minute. Then Wellman asked the storekeeper
for a box of shells. Dickson could not remember any discussion
prior to entering the store about who would purchase shells.
Back in the truck, O'Brien gave Dickson directions. At this time,
there was no indication to Dickson that a robbery was going to take
place.

14

Dickson parked his truck next to a white pickup truck already parked in the driveway. O'Brien got out of the truck and knocked on the door. He opened the door, then came back to the truck, saying, "I believe my buddy is home." He picked up the gun with a blanket, unwrapped it, and said, "Come on in. I can get your $20 for gas." The three walked up to the house.

Immediately after they walked in, someone came out of a bedroom with a rifle and said, "What the fuck are you doing in my house, Sean?" Dickson and Wellman turned and started to leave. The last thing Dickson saw before he left was two guns pointing at each other.

Dickson and Wellman got into Dickson's truck. Wellman crouched down. Dickson scrambled for his keys and tried to start the truck. As soon as he started to truck and put it in gear, O'Brien came out of the house, pointed the gun at them, and said, "Stop or I'll shoot. He's dead. He's dead. He's dead." O'Brien directed Dickson to come back to the house and to have Wellman turn the truck around.

From the doorstep, Dickson heard O'Brien going through drawers and cabinets. Dickson did not go back inside the house, but Wellman did. O'Brien slammed open a bedroom door and said, "Come here." Both O'Brien and Wellman went into the room for less than a minute. Someone yelled, "Let's get the hell out of here," and the three ran to the truck. O'Brien was carrying the shotgun. Dickson did not see who was carrying the rifle.

O'Brien directed Dickson to drive to a pond on Forni Road. While driving there, O'Brien said J.D. Petty had given him the shotgun. At the pond, O'Brien opened the door and threw the rifle into the pond.

They drove back to O'Brien's house. O'Brien said he did not want to see either Dickson or Wellman again. They were not to tell anyone about what happened. He got out and slammed the door. That was the last time Dickson saw him.

Dickson and Wellman drove back to Lions Hall. They drove their trucks to a gas station and had a brief discussion. Then Dickson went to work.

(Slip Op. at p. 2-25.)

Petitioner was convicted by a jury of first-degree murder. He received a sentence of

twenty-six years to life imprisonment for the first-degree murder and a firearm enhancement.[2]
Petitioner appealed to the California Court of Appeal, Third Appellate District.  Petitioner raised
several arguments on appeal, including the two he raises in this federal habeas petition.   The
California Court of Appeal reversed a robbery special circumstance with respect to Petitioner.
That issue is not relevant to this federal habeas proceeding.  In all other respects, the California
Court of Appeal affirmed the judgment.  Petitioner did not appeal to the California Supreme
Court.[3]

On February 10, 2010, Petitioner filed the instant counseled federal habeas petition
raising the two claims outlined in supra Part I.  Respondent initially answered this petition on
July 28, 2010.  Respondent filed an amended answer on August 16, 2010 which included an
argument that Petitioner failed to exhaust his two claims in state court because he never appealed
to the California Supreme Court.  Even though the Respondent raised the exhaustion issue, he
also stated that each of Petitioner's claims were meritless and that "this Court may dismiss the
claims for failure to exhaust, or deny the claims on the merits."  (Resp't's Am. Answer at p. 22.)

III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state
court can only be granted for violations of the Constitution or laws of the United States.  See 28
U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.
Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).
Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

---

[2] Dickson received a sentence of life imprisonment without the possibility of parole.

[3] In his Traverse, Petitioner states Petitioner's direct appeal was consolidated with
O'Brien's at the California Court of Appeal level.  (See Pet'r's Traverse at p. 4.)  He then goes
onto state that O'Brien filed a petition for review to the California Supreme Court after the
California Court of Appeal's denial in August 2008.  Petitioner then states that "[t]he California
Supreme Court labeled O'Brien's case as the lead case, and also listed Petitioner's case under the
same case number [S166673]."  (Id.)  A scan of the docket in that California Supreme Court case
lists only O'Brien as the only petitioner, thus it appears that Petitioner was never part of that
appeal to the California Supreme Court.

1   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

2   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

3   decided on the merits in the state court proceedings unless the state court's adjudication of the

4   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

5   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

6   resulted in a decision that was based on an unreasonable determination of the facts in light of the

7   evidence presented in state court.  See 28 U.S.C. 2254(d).

8          As a threshold matter, this Court must "first decide what constitutes 'clearly established

9   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrande,

10  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

11  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

12  at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

13  application clause, a federal habeas court making the unreasonable application inquiry should ask

14  whether the state court's application of clearly established federal law was "objectively

15  unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

16  not issue the writ simply because the court concludes in its independent judgment that the

17  relevant state court decision applied clearly established federal law erroneously or incorrectly.

18  Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

19  law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

20  determining whether a state court decision is an objectively unreasonable application of clearly

21  established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

22  the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

23  applied, we may look for guidance to circuit precedents.").

24         However, Petitioner never filed an appeal to the California Supreme Court (although his

25  co-defendant O'Brien did).  A petitioner satisfies the exhaustion requirement by providing the

26  highest state court with a full and fair opportunity to consider each claim before presenting it to

17

1   the federal court.  See Baldwin v. Reese, 541 U.S. 27, 29 (2004); Fields v. Washington, 401 F.3d

2   1018, 1020 (9th Cir. 2005).  Since Petitioner never allowed the California Supreme Court to

3   analyze his claims as they applied to him, his federal habeas petition is deemed unexhausted.

4   See 28 U.S.C. § 2254(b)(1).  However, unexhausted claims "may be denied on the merits,

5   notwithstanding the failure of the applicant to exhaust the remedies in the courts of the State."

6   Id. § 2254(b)(2).  A federal court considering a habeas corpus petition may deny an unexhausted

7   claim on the merits when it is perfectly clear that the claim is not "colorable."  See Cassett v.

8   Stewart, 406 F.3d 614, 624 (9th Cir. 2005) ("the principle of comity counsels in favor of a

9   standard that limits a federal court's ability to deny relief under § 2254(b)(2) to circumstances in

10  which it is perfectly clear that the petitioner has no hope of prevailing").  Thus, this standard will

11  be used in analyzing Petitioner's Claims.[4]

12                          IV.  ANALYSIS OF PETITIONER'S CLAIMS

13          A. Claim I

14          In Claim I, Petitioner argues that he is entitled to federal habeas relief because the

15  prosecution failed to disclose purportedly material information concerning the prosecution's

16  pathologist, Dr. Rollins.  Specifically, Petitioner asserts that the prosecution failed to disclose

17  that Dr. Rollins had a history of abusing narcotic pain relievers.  Petitioner claims that this

18  information was material because this information could have been used to challenge Dr.

19  Rollins' credibility and opinion regarding the time of death there by resulting in a different

20  outcome at trial.  The California Court of Appeal provided the relevant background and analysis

21  to this Claim that will be helpful in determining whether it is deemed "colorable."  The

22  California Court of Appeal stated the following:

23  //

24  _____

25          [4] It is also worth noting that while the arguments of Claim I between Petitioner and
    O'Brien appeared similar (although not identical) before the California Court of Appeal,
26  obviously their arguments with respect to Claim II were different in light of the different
    sentences each received.

A.  Additional background information

1.  Disclosure at trial

On the morning he was to testify at trial, Dr. Rollins testified at an Evidence Code section 402 hearing held in chambers.  The prosecutor, Joseph Alexander, asked three questions:

"Q.  Dr. Rollins, this morning you told me in my office that you have a prior history of drug abuse; is that correct?
"A.  True.
"Q.  And do you currently use or abuse narcotics?
"A.  No.
"Q.  How long has it been that you've been sober?
"A.  March 18, 2001.  It's coming up on three years."  The prosecutor asked no further questions.  [FN 20]
[FN 20]  In a March 2005 declaration, Alexander stated that he had no knowledge of Dr. Rollins's drug problem prior to that morning of trial.  He had spoken with Dr. Rollins by telephone and met with him in person, and on none of those occasions did Dr. Rollins disclose any prior drug problems or criminal actions as a result of those problems.  On the morning he was scheduled to testify, Dr. Rollins met with Alexander and asked him if he thought the defense would cross-examine him concerning his "<u>Brady</u>" history.  Alexander asked Dr. Rollins what he meant.  Dr. Rollins told him he had a history of substance abuse.  Alexander told Dr. Rollins he knew what "<u>Brady</u>" referred to, but he did not tell Dr. Rollins that he already knew about Dr. Rollins's "<u>Brady</u>" information or his "<u>Brady</u> packet."  Because they were due in court, Alexander did not question Dr. Rollins further.  Upon arriving at court, Alexander informed the trial judge and opposing counsel that a matter had come up that needed to be addressed outside the presence of the jury.  They met in chambers, where Alexander explained off the record his earlier conversation with Dr. Rollins.  He said he did not know any details concerning Dr. Rollins's history of substance abuse, and he suggested they hold an evidentiary hearing on the record where defense counsel could examine Dr. Rollins on the information Dr. Rollins gave to Alexander that morning.

Under cross-examination, Dr. Rollins testified that his drug of choice was Demerol.  He had originally been working for Sacramento County when he took a job as the chief medical coroner in a county in northern Arizona.  He completed a five-month in-house rehabilitation in Georgia, and he resigned his Arizona position upon completing his treatment.  He returned to Sacramento County.  In December 2001 he resumed his previous employment with the Sacramento County Coroner's office.

Dr. Rollins stated that as a condition of his current employment, he is subject to random urine tests once a week.  None of these tests have been positive since he resumed work for Sacramento County.

Neither the prosecution nor counsel for either defendant asked Dr. Rollins any further questions.

In light of the testimony, the trial court (Judge Proud) ruled that Rollins's history of drug abuse was not to be raised in front of the jury. When asked if they had a problem with that ruling, both defense counsel replied they did not.

As discussed above, Dr. Rollins proceeded to testify as to the cause and time of death. He placed the time of death at sometime between 10:30 a.m. and 12:30 [p].m. This evidence was significant. No physical evidence directly placed O'Brien at the crime scene, and O'Brien, relying on prosecution witness testimony, proffered an alibi for his whereabouts the day of the murder up to 10:30 a.m. and after 11:25 a.m. Dr. Rollins's opinion placed the time of death within the 55-minute gap in O'Brien's alibi defense.

2. Posttrial discovery

During an October 15, 2004 posttrial hearing, O'Brien's new defense attorney stated that Dr. Rollins had suffered "felony convictions" in Arizona. Prosecuting attorney Alexander stated in a subsequent declaration that defense counsel's October 2004 statement was the first time he had heard that Dr. Rollins might have a criminal history.

After that hearing, Alexander did some more investigation, and he obtained from Dr. Rollins a number of documents regarding a criminal case in Arizona that had been prosecuted against him. Alexander immediately faxed these documents to defense counsel on October 20, 2004. The documents included a December 2001 "Stipulated Guilty Plea" filed in Coconino County Superior Court, Arizona, by which Dr. Rollins pled guilty to possessing drug paraphernalia, a misdemeanor, and to possession or use of narcotic drugs, a felony.

Also included was a January 2002 minute order from the same Arizona court ruling on Dr. Rollins's plea. The court accepted Dr. Rollins's plea only as to the misdemeanor, but it adjudged him guilty of the pleaded crimes. For the misdemeanor count, the court suspended imposition of sentence and placed Dr. Rollins on probation for one year. As to the felony count, the court stated it was "deferring acceptance of the plea agreement for a period of one year, giving [Dr. Rollins] time to complete the California Physician Diversion Program."

In response to this disclosure, O'Brien, on November 29, 2004, filed a motion for discovery. Among other items, he sought to obtain a list of all cases in which Dr. Rollins had been called as a prosecution witness by the El Dorado County District Attorney's

1  office.

2  The prosecution opposed the motion for discovery.  It asserted Dr.
   Rollins had not suffered a felony conviction; his misdemeanor
3  conviction did not involve conduct amounting to moral turpitude;
   the People had not engaged in a pattern or practice of concealing
4  Dr. Rollins's drug problems, and the evidence was not material.  It
   claimed the People were not aware of any felony or misdemeanor
5  convictions against Dr. Rollins until defense counsel raised the
   issue in October 2004.

6
   As part of its opposition to the discovery motion, the prosecution
7  submitted an order issued by the Arizona court on March 10, 2003,
   dismissing Dr. Rollins's plea to the felony possession charge.  In
8  that order, the court noted it had deferred accepting the plea for one
   year, and that under the plea agreement, it was to dismiss the
9  charge if Dr. Rollins complied with the terms of the California
   Medical Board's diversion program.  Dr. Rollins had complied.
10 The court thus terminated his probation term, vacated the felony
   plea, and dismissed the felony charge with prejudice.

11
   The trial court granted the request for discovery in part, including
12 the request for the list of cases in which Dr. Rollins testified.
   According to the Attorney General, the prosecution informed the
13 defendants of two such cases.  One was a 1999 case entitled People
   v. Williams.  The defense attorney in that case was Judge Proud,
14 who at the time was in private practice.

15 3.  Motions to recuse trial court and district attorney

16 Defense counsel asked Judge Proud to submit to an interview to
   determine whether he received materials on Dr. Rollins's criminal
17 record from the district attorney's office during the 1999 Williams
   case.  The judge refused.  Defense counsel then filed a motion to
18 disqualify Judge Proud from any further participation in this case.

19 In his verified answer to the motion, Judge Proud stated that when
   he was defense counsel in the Williams case, he had no knowledge
20 of Dr. Rollins's criminal record.  He did not recall whether the
   issue of Dr. Rollins's substance abuse came up during the case.

21
   The motion to recuse was heard in Placer County Superior Court,
22 and that court denied the motion in February 2005.  However, in
   November 2005, our court issued a writ of mandate directing the
23 trial court to grant O'Brien's motion to disqualify Judge Proud.  In
   April 2006, the presiding judge of El Dorado Superior Court
24 assigned all further matters in this case to Judge Phimister.

25 Meanwhile, in April 2005, O'Brien filed a motion to recuse
   prosecutor Alexander and the El Dorado County District
26 Attorney's Office on the ground the prosecutor had failed to

21

disclose Dr. Rollins's criminal history prior to trial.  To prove the district attorney had knowledge of Dr. Rollins's history prior to O'Brien's 2004 trial, O'Brien submitted into evidence documents faxed from the Sacramento County District Attorney's office to Gary Lacy, El Dorado County District Attorney.  The fax was sent on September 30, 2002.  The documents included minutes from the Arizona Board of Medical Examiners' meeting of March 6, 2002, where that board placed Dr. Rollins on administrative probation for five years.  The fax also included news articles from the Arizona Daily Sun detailing Dr. Rollins's arrest and subsequent guilty plea.

After Judge Phimister took over the case in April 2006, O'Brien submitted additional evidence in support of his motion to recuse the district attorney.  He submitted a May 2006 declaration by Cynthia Besemer, Chief Deputy District Attorney for Sacramento County.  She declared she instructed her secretary to fax the materials on Dr. Rollins to El Dorado County District Attorney Lacy in 2002.  Her office was familiar with Dr. Rollins and had opposed his rehiring by the Sacramento County Coroner.  Besemer received assurances from the Coroner that Dr. Rollins would not work on any coroner's case that would lead to criminal court proceedings.

Besemer said it was her office's practice to provide information to defense attorneys about Dr. Rollins's drug problems and criminal conviction in every case because it believed it constituted <u>Brady</u> material.

In 2002, she learned that the Sacramento County Coroner's Office contracted to perform autopsies for other counties, including Amador County and El Dorado County.  She was informed that Dr. Rollins would be performing autopsies in those counties that could lead to criminal proceedings.  Thus, she faxed to the district attorneys in those counties the package of materials discussed above.

Besemer recalled speaking with Lacy by telephone before she faxed him the materials.  She did not recall the exact conversation, but her purpose was to inform Lacy of Dr. Rollins's situation so that Dr. Rollins's possible testimony would not damage Lacy's prosecutions.  [FN 21]
[FN 21]  Besemer spoke again with Lacy after she had given the same information on Dr. Rollins to O'Brien's defense attorney.  She told Lacy she had to provide the documents to O'Brien because they were public.  She had provided the same information to defense counsel in her cases where Dr. Rollins would testify.  According to Besemer, Lacy stated it was not a problem because he did not consider the information to be <u>Brady</u> material.

In addition to the declaration by Besemer, O'Brien attached a declaration from Amador County District Attorney Todd Riebe as

1  support for his motion to recuse.  Riebe declared that in September
2002, he received a telephone call from Sacramento County
2  District Attorney Jan Scully informing him of Dr. Rollins's drug
problems and his Arizona convictions.  He also received from her a
3  fax with the same documents received that month by Lacy.

4  4. Motion for new trial

5  In July 2006, O'Brien filed his motion for new trial.  In addition to
the grounds discussed above, one of the grounds for new trial was
6  the prosecution's alleged Brady violation for not disclosing Dr.
Rollins's criminal record.  In support of the motion, O'Brien
7  included, among other documents, a December 2004 declaration by
Dr. Rollins.  Dr. Rollins claimed that the morning he was to testify
8  at trial, he informed prosecutor Alexander about his prior problems
with Demerol and that he had been through rehabilitation.
9  According to Dr. Rollins's declaration, Alexander stated he was
aware that Dr. Rollins had a "Brady package," and he suggested
10  they have a discussion with opposing counsel and the judge about
it on the record.

11
O'Brien also submitted a transcript from a 2002 Alameda County
12  Superior Court trial, People v. Daveggio and Michaud, in which
Dr. Rollins testified as a witness.  Under voir dire, Dr. Rollins
13  admitted he had recently concluded he was addicted to Demerol.
He began using Demerol without a prescription in 1988, although
14  he had experimented with other drugs.

15  Dr. Rollins generally would use drugs one to three times a year,
taking, as he called it, a "mini vacation" when he did not have any
16  tests or exams pending and was at home isolated from other
people.  He would use drugs that he had bought and paid for
17  himself through the coroner's office.  He would place them in a
location he was allowed to have them under his certificate from the
18  federal Drug Enforcement Authority.  When he would use the
drugs, he would simply remove them from his stock and administer
19  them to himself.

20  Dr. Rollins first sought treatment for his addiction in 1998.  At that
time, he had been in a long-term romantic relationship, and when
21  he realized the relationship would end, he overdosed on the drug,
nearly killing himself.  After treatment, he was free of Demerol for
22  about a year and a half, until around 2000.  He relapsed for a week
after deciding to leave Sacramento and look for another job.
23  The next, and last, time Dr. Rollins improperly used Demerol was
in January 2001 in Arizona.  He entered a treatment program in
24  Georgia for five months.  After completing the treatment, he was
indicted by a grand jury and he entered his plea.  He voluntarily
25  joined a diversion program for a year, which included group
therapy meetings twice a week.  [FN 22]
26  [FN 22] Following Dr. Rollins's testimony, the Alameda County

court accepted Dr. Rollins as an expert in the area of forensic
pathology.

The prosecutor opposed O'Brien's motion for a new trial. He did
not dispute that the information on Dr. Rollins's criminal
background should have been given to the defense prior to trial.
He argued, however, that the failure to disclose did not deny
O'Brien a fail trial. The criminal information was not material
because it would allow impeachment on only a collateral issue. As
it was, Dr. Rollins testimony at trial was a "serious blow" to the
People's case. He testified the time of death was between 10:30
a.m. and 12:30 p.m., but was likely closer to 12:30 p.m. O'Brien
had an "undisputed alibi for his whereabouts from 11:30 a.m. until
after the victim's body was discovered."

Dr. Rollins's criminal history, the prosecution argued, did not call
into question the validity of Dr. Rollins's expert opinion on the
time of death. However, the prosecutor acknowledged the
evidence concerning Dr. Rollins was not adequately investigated or
provided to the defense prior to trial.

5. Trial court's rulings

The trial court held a hearing on both the motion to recuse the
prosecutor and his office and the motion for new trial. At the
hearing, the prosecutor stated the People were not contesting
whether Besemer had a phone conversation with Lacy or that she
faxed documents concerning Dr. Rollins to Lacy. Lacy claimed he
did not recall receiving them, but the fax number on the cover page
was the number for the fax machine that sits next to his desk.

The trial court denied the motion to recuse the prosecutor or his
office, concluding no <u>Brady</u> violation occurred because the
withheld information was not admissible. It noted Dr. Rollins's
criminal information was in the prosecution's possession prior to
trial. However, Dr. Rollins's only conviction in Arizona was for a
misdemeanor. There was no felony conviction because the
Arizona court never accepted the plea agreement as to the felony
plea, it deferred entry of the plea, and ultimately dismissed that
charge with prejudice. And, the court determined, the charged
crimes, whether felony or misdemeanor, did not involve moral
turpitude.

The court also determined Dr. Rollins was not on probation at the
time of the autopsy. Even though he had not yet petitioned the
Arizona court to set aside his plea, his one-year probationary
period had expired by the time he performed the autopsy.

The court stated the question before it was whether the district
attorney's office should be recused for not providing sufficient
information to allow the defense to examine Dr. Rollins on his past

24

drug use and what effect, if any, it had on his ability to perform the autopsy.  It concluded the in-trial disclosure was sufficient to enable the defense to question Dr. Rollins on his ability to perform.  It believed Judge Proud would have denied admission of the Arizona court history under Evidence Code section 352.  The district attorney's office could have done better handling discovery in this case, but its actions did not warrant recusal.

The trial court also denied the motion for new trial.  When it did so, the court again addressed the Brady issue.  It noted that all violations of Brady do not automatically result in a verdict being set aside.  A reversible violation must concern evidence that was material.  Here, the evidence of Dr. Rollins's Arizona criminal case was not admissible, and thus, not material, because there was no felony conviction that could be used for impeachment purposes and probation had terminated.

The court stated materiality was limited to whether Dr. Rollins, a former addict, was under the influence of a controlled substance when he performed the autopsy or formed his opinions.  That issue was reviewed in the Evidence Code section 402 hearing at trial.  The Arizona information would have allowed the defense only to ask additional questions about Dr. Rollins's drug use.  It would not have established that Dr. Rollins was under the influence of drugs at the time he performed his autopsy or formed his opinions in this case.  It would have established only that he had been addicted to Demerol at one time, had been in treatment, and had tested regularly without positive test results.

"So if there's a Brady issue," the court said, "the Brady issue was resolved based on this Court's finding that the evidence – the additional information, while possibly material, would only have been used to be cumulative to further evaluate the ability of Dr. Rollins to perform his examination of the decedent."  Knowledge of the evidence would not have changed the case, the court concluded, "in that it is significantly inadmissible, and at best would go to the issue of cumulative evidence."

B.  Analysis

In a Brady claim, conclusions of law or mixed questions of law and fact, such as the elements of a Brady claim, are subject to independent review.  Findings of fact are entitled to great weight when supported by substantial evidence.  (People v. Salazar (2005) 35 Cal.4th 1031, 1042.)

"In Brady, the United States Supreme Court held 'that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution.'  (Brady, supra, 373 U.S. at p. 87.)  The

high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused (United States v. Agurs (1976) 427 U.S. 97, 107 [49 L.Ed.2d 342]), that the duty encompasses impeachment evidence as well as exculpatory evidence (United States v. Bagley (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481]), and that the duty extends even to evidence known only to police investigators and not to the prosecutor (Kyles v. Whitley (1995) 514 U.S. 419, 438 [131 L.Ed.2d 490]).  Such evidence is material '"if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."'  (Id. at p. 433.)  In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'  (Kyles, supra 514 U.S. at p. 437; accord, In re Brown (1998) 17 Cal.4th 873, 879.)

"'[T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "Brady material" – although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.  There are three components of a true Brady violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'  (Strickler v. Greene (1999) 527 U.S. 263, 281-282 [144 L.Ed.2d 286], fn. omitted).  Prejudice, in this context, focused on 'the materiality of the evidence to the issue of guilt or innocence.'  (United States v. Agurs, supra, 427 U.S. at p. 112, fn.20; accord, U.S. v. Fallon, (7th Cir. 2003) (348 F.3d 248, 252.)  Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible (cf. Wood v. Bartholomew (1995) 516 U.S. 1, 2 [133 L.Ed.2d 1]), that the absence of the suppressed evidence made conviction 'more likely' (Strickler, supra, 527 U.S. at p. 289), or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' (ibid.).  A defendant instead 'must show a "reasonable probability of a different result."'  (Banks v. Dretke (2004) 540 U.S. 668, 699 [157 L.Ed.2d 1166].)"  (People v. Salazar, supra, 35 Cal.4th at pp. 1042.1043.)

"Evidence would have been *material* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different.  The requisite *reasonable probability* is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court.  It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the

abstract. [Citation.]" (People v. Dickey (2005) 35 Cal.4th 884, 907-908, original italics.)

There is no dispute that Lacy, the district attorney, had a duty to inform his deputies of what he knew about Dr. Rollins, or that the prosecutor had an obligation to learn of any evidence by Dr. Rollins that would be favorable to the defense. Dr. Rollins was acting on the government's behalf in this case, and information regarding his prior drug abuse was potentially favorable to the defense as impeachment evidence. The district attorney had a duty to investigate and learn all he could about this evidence so he could determine how to comply with his Brady obligations. In this case, the district attorney had actual knowledge, and he downplayed and disregarded it for whatever reason. He and his office did not fulfill their responsibility here. Their failure to do so, however, while it casts them in a bad light, does not end our discussion.

To establish a violation of Brady, the defendants still had to show that the nondisclosed information was material, i.e., had the information been disclosed to the defense, there is a reasonable probability of a different result. Defendants fail to make that showing. The result would not have changed because much of the evidence was inadmissible as impeachment evidence. That which was admissible would not have lead to a different outcome. Moreover, disclosure would not have altered, indeed, it did not alter, the defendants' trial strategies.

The Arizona misdemeanor conviction was not admissible. Misdemeanor convictions are admissible subject to the relevance requirement of moral turpitude. (People v. Wheeler (1992) 4 Cal.4th 284, 296.) Possession of narcotic paraphernalia is not a crime of moral turpitude. (People v. Cloyd (1997) 54 Cal.App.4th 1402, 1409.) Defendants would not have been allowed to impeach Dr. Rollins with the misdemeanor evidence.

The conditional Arizona felony possession plea was not admissible because it did not result in a conviction, had been dismissed due to the condition occurring, and, in any event, did not involve moral turpitude. The Arizona court never accepted Dr. Rollins's plea, and it ultimately dismissed the felony charge with prejudice. In short, there was no felony conviction and no admissible misdemeanor conviction to introduce for impeachment purposes. And, standing alone, Dr. Rollins's conduct of being addicted and unlawfully possessing narcotics did not involve moral turpitude. (People v. Castro (1985) 38 Cal.3d 301, 317.) Thus, this conduct was not admissible for impeachment purposes.

Defendants claim Dr. Rollins's testimony in the Alameda County case, where he gave a history of his drug abuse and explained how he obtained the drugs, shows that Dr. Rollins lacked judgment and engaged in dishonest conduct. However, narcotic addiction not

related to the specific autopsy or to the period of time of observation of the pertinent facts or testimony is not admissible without expert testimony showing a detrimental effect on the witness's abilities.  (People v. Pargo (1966) 241 Cal.App.2d 594, 600; People v. Bell (1955) 138 Cal.App.2d 7, 11-12.)  "[S]uch evidence is inadmissible unless testimony of the use of heroin or any other drug tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics."  (People v. Hernandez (1976) 63 Cal.App.3d 393, 405.)

Defendants made no offer of proof showing Dr. Rollins was under the influence of drugs while he examined the victim, performed the autopsy, prepared his report, or testified at trial.  They also offered no expert testimony showing Dr. Rollins's past drug abuse somehow affected his ability to make honest medical judgments and observations when he was called upon to do so in this case.  Thus, the additional evidence of Rollins's past drug use would not be admitted for impeachment purposes.

Even if Dr. Rollins's testimony as to how he obtained the drugs had been admissible, it would still fail the materiality requirement.  Dr. Rollins explained in his Alameda County testimony that he purchased the drugs through the coroner's office, stored them there in an authorized storage location, and used them without a prescription.  For purposed of argument only, we assume Dr. Rollins's abuse of his medical credentials and the county coroner's office indicates a character trait of dishonesty and moral turpitude.  Disclosure of this information and impeachment of Dr. Rollins with it, however, would not have created a reasonable probability of a different outcome.  When we consider this evidence in conjunction with all of the evidence in this case, our confidence in the verdict is not undermined.

First, it is doubtful the evidence would have undermined the jury's belief in Dr. Rollins's testimony of the time of death.  Dr. Rollins had no motive to lie about the time the victim died, and, indeed, the estimated time frame of death included times when O'Brien claimed to have an alibi.  Nothing in the record suggests any reason why Dr. Rollins would fabricate the time of death.

Second, the incriminating evidence in the record is overwhelming.  Defendant Dickson testified that he, Wellman, and O'Brien, who was armed with a shotgun, drove to the Treasure Lane home to get drugs, dirt bikes and cash.  They stopped at the Big Horn Gun Shop along the way and acquired shotgun shells.  He and Wellman ran out of the house when O'Brien and the victim were pointing guns at each other.  O'Brien exited the house carrying an shotgun and told them the victim was dead.  They threw the victim's rifle into a pond.  Dickson later showed law enforcement officers where they

had disposed of the victim's rifle, and the rifle was later retrieved from that location.  Dickson's testimony corroborated the major points of Wellman's testimony.

Even without Dr. Rollins's testimony, there remains a 55-minute gap that O'Brien cannot fill with the testimony in the record.  The time estimates given by the witnesses, the experimental evidence of the time to make the route likely used by the defendants, and the lack of an alibi for those 55 minutes are sufficient grounds to support the verdict.  Testimony as to how Dr. Rollins obtained narcotics two years earlier would not have undermined this evidence.

Dickson additional complains that had the evidence of Dr. Rollins's prior drug use been disclosed, he likely would not have testified on his own behalf.  But, as already explained, most of the nondisclosed evidence was inadmissible, and the disclosed evidence was ruled inadmissible.  We doubt Dickson's decision to testify would have changed had he known about the manner in which Dr. Rollins obtained his drugs two years previously, as that information had little bearing on the credibility of Dr. Rollins's time-of-death assessment here.  [FN 23]
[FN 23]  Our confidence in the verdict is further strengthened by Dr. Herrmann's substantial corroboration of Dr. Rollins's estimated time of death.

We thus conclude defendants have not satisfied their burden of establishing materiality in order to prove a <u>Brady</u> violation.  As a result, the trial court did not err in denying a new trial on this basis.

(Slip Op. at p. 56-75.)

As noted by the California Court of Appeal, in <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Impeachment evidence, as well as exculpatory evidence, falls within the <u>Brady</u> rule, and the prosecutor is obliged to disclose both, even in the absence of a specific discovery request.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 676-77 (1985).  "There are three components to a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused, either because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently, and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

29

1    The prejudice element of a <u>Brady</u> inquiry is also described as "materiality," i.e., that "the

2    suppressed evidence must be material to the guilt or innocence of the defendant." <u>United States</u>

3    <u>v. Jernigan</u>, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc).  Evidence is considered material

4    under <u>Brady</u> only if there is "a reasonable probability that, had the evidence been disclosed to the

5    defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514 U.S. 419,

6    433-34 (1995) (internal quotation marks and citation omitted).  A "reasonable probability" means

7    a probability "sufficient to undermine confidence in the outcome" of the trial.  <u>Bagley</u>, 473 U.S.

8    at 682.  Furthermore, materiality under <u>Brady</u> requires that the undisclosed information or

9    evidence be admissible or lead to admissible evidence.  <u>See</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1,

10   5-7 (1995) (per curiam) (holding that polygraph test rests were not material under <u>Brady</u> because

11   the results were inadmissible under state law and therefore were not "evidence," and because the

12   polygraph results would not have led to any additional admissible evidence).

13   Petitioner argues that the prosecutor's failure to disclose Dr. Rollins' Arizona case and

14   the surrounding proceedings amounted to a <u>Brady</u> violation.  Specifically, Petitioner argues that

15   the failure to provide information about Petitioner's Arizona criminal conviction amounted to a

16   <u>Brady</u> violation requiring the grant of federal habeas relief.  (<u>See</u> Pet'r's Pet. at p. 39.)  Petitioner

17   states that Dr. Rollins' testimony was key to the prosecution as to the time of death being

18   somewhere between 10:30 a.m. and 12:30 p.m. on February 26, 2003 because O'Brien had an

19   alibi from 11:30 a.m. onward that day and the strength of O'Brien's alibi "was an important

20   factor and consideration in Petitioner strategy and decision on whether to testify." (<u>Id.</u> at p. 41.)

21   Petitioner argues that <u>Brady</u> imposes "a duty upon the prosecution to determine and

22   reveal the felony conviction of every material prosecution witness." (<u>Id.</u> at p. 38.)  As the

23   California Court of Appeal noted, Dr. Rollins pled guilty and the court accepted his plea to a

24   misdemeanor conviction possession of drug paraphernalia in the Arizona proceedings in

25   December 2001.  (<u>See</u> Clerk's Tr. at p. 2320.)  The Arizona court deferred the entry of a guilty

26   plea on a felony count of possession or use of narcotic drugs.  (<u>See</u> <u>id.</u>)  As noted above, only

30

admissible evidence under state law is considered "material" under <u>Brady</u>.  <u>See</u> <u>Wood</u>, 516 U.S.

at 5-7.  Here, as noted by the California Court of Appeal, the misdemeanor possession of drug

paraphernalia would not be admissible under these circumstances as it was not a misdemeanor

involving moral turpitude.  <u>See</u> <u>People v. Cloyd</u>, 54 Cal. App. 4th 1402, 1409, 64 Cal. Rptr. 2d

104 (1997) (holding that possession of narcotic paraphernalia does not involve moral turpitude).

Furthermore, as the Arizona court never accepted Dr. Rollins' plea on the felony count, there was

no felony conviction to disclose to the Petitioner that would have been admissible, i.e.,

"material."

Besides the criminal conviction argument, Petitioner also argues that the prosecutor failed

to supply Petitioner with additional exculpatory evidence concerning Dr. Rollins that amounted

to a <u>Brady</u> violation requiring federal habeas relief; specifically Petitioner states that:

> At the in-chambers hearing prior to his trial testimony, in response
> to a question from the prosecutor, Dr. Rollins testified about his
> use of Demoral [sic]  and that he had completed a rehab program.
> The prosecutor did not reveal that Dr. Rollins had sustained a
> criminal conviction and was placed on probation.  The prosecutor
> did not reveal that Dr. Rollins was subject to drug testing only
> because it was a condition of his probation.  The prosecutor did not
> reveal that Dr. Rollins had an addiction to Demerol and had almost
> died of a Demerol overdose.  The prosecutor did not reveal that Dr.
> Rollins stole the Demerol from his employer.  The prosecutor did
> not reveal that Dr. Rollins misused his medical license by illegally
> using it to obtain narcotics.  Finally, the prosecutor did not reveal
> that Dr. Rollins was on probation from both the Arizona court and
> from the medical licensing board at the time he performed the
> autopsy in this case . . . . The prosecutor lead the court and defense
> counsel to believe that Dr. Rollins had abused drugs in the past,
> had gone into rehab for his drug use, and was now clean and sober.

(Pet'r's Pet. at p. 40.)  These arguments can be separated into two different categories.  First,

Petitioner argues that Dr. Rollins's drug addiction "could have challenged Dr. Rollins's medical

judgment."  (<u>See</u> Pet'r's Traverse at p. 8.)  Petitioner argues this is important in light of the fact

that Dr. Rollins's testimony regarding the time of death was critical to the prosecution's case in

light of O'Brien's alibi after 11:30 a.m.  Second, Petitioner's argument also appears to focus on

the fact that Dr. Rollins obtained the drugs through his use and abuse of his medical license.

1    Each of these arguments were considered by the California Court of Appeal on direct appeal, and

2    will be analyzed to determine whether they are "colorable."

3          The first issue is whether Dr. Rollins' drug addiction was material, i.e., admissible for

4    Petitioner to raise a colorable <u>Brady</u> argument.  Once again, it is important to examine California

5    state law to see if Dr. Rollins' drug addiction could have been admissible to challenge his

6    medical judgment with respect to the victim's time of death.  As indicated by the California

7    Court of Appeal, testimony as to narcotic addiction, or expert testimony as to the effects of the

8    use of such drugs, is not considered admissible in order to impeach the witness unless followed

9    by testimony showing that the witness was, inter alia, under the influence of drugs at the time of

10   the events in testimony.  <u>See</u> <u>People v. Hernandez</u>, 63 Cal. App. 3d 393, 405, 133 Cal. Rptr. 745

11   (1976) ("In <u>People v. Ortega</u> (1969) 2 Cal.App.3d 884, 898-902, 83 Cal. Rptr. 260, the court held

12   that proof of a narcotic addiction, standing alone, is inadmissible to impeach the credibility of a

13   witness and that such evidence is not only collateral thereto but highly prejudicial.  In cases

14   decided after <u>People v. Ortega</u>, <u>supra</u>, it has been held that such evidence is inadmissible unless

15   testimony of the use of heroin or any other drug tends to show that the witness was under the

16   influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred,

17   or (3) that his mental faculties were impaired by the use of such narcotics.").  As explained by the

18   California Court of Appeal, there was no evidence provided that Dr. Rollins was under the

19   influence of drugs "while he examined the victim, performed the autopsy, prepared his report, or

20   testified at trial."  (Slip Op. at p. 73.)  Dr. Rollins testified that he had been sober since March 18,

21   2001, almost two years prior to the murder of the victim.  (<u>See</u> Reporter's Tr. at p. 1054.)  Thus,

22   the fact that there was a failure to disclose the full extent of Dr. Rollins' drug abuse does not

23   amount to a <u>Brady</u> violation as the evidence would not have been admissible, and thereby

24   material, evidence to impeach Dr. Rollins at trial.

25         Next, Petitioner argues that the failure to disclose the misuse of Dr. Rollins' medical

26   license to obtain the Demerol amounted to a <u>Brady</u> violation necessitating federal habeas relief.

1    Even if this evidence had been disclosed and the use of this information to impeach Dr. Rollins

2    would not have, to a reasonable probability changed the outcome of the proceeding against

3    Petitioner.  The incriminating evidence in this case was strong as described in <u>supra</u> Part II.  By

4    way of example only, it included the testimony of Wellman and Dickson who largely

5    corroborated each other's testimony (such as throwing the victim's gun into the pond).  Without

6    Dr. Rollins' testimony, there was still a large enough period of time for the murder to take place

7    between 10:30 a.m. and 11:30 a.m.[5]

8           Finally, Petitioner argues that had the evidence of Dr. Rollins's prior drug use and

9    conviction been disclosed, he would not have taken the stand in his own defense.  Petitioner

10   argues that:

11                   Petitioner was not aware that substantial and credible evidence was
                     available to impeach Dr. Rollins's and his conclusions.  The
12                   inability to impeach and challenge Dr. Rollins's conclusion as to
                     the time of death, and therefore its effect on defendant O'Brien's
13                   alibi defense, was factored into Petitioner's decision to testify on
                     his own behalf.  Indeed, Petitioner's trial attorney would not have
14                   supported Petitioner's decision to testify had he been given the
                     impeachment material on Dr. Rollins.
15

16   (Pet'r's Pet. at p. 43.)  However, as previously noted, the "evidence" concerning Dr. Rollins's

17   drug abuse would have been deemed inadmissible at trial and thus would not have even been

18   "evidence" at trial.  Additionally, the trial included various other pieces of evidence implicating

19   the defendants (including Petitioner) in the crime, such as Wellman's testimony.  Finally, it is

20   worth noting that Dr. Herrmann's findings did not necessarily contradict Dr. Rollins's regarding

21   the time of death.

22

23           [5] It is also worth noting that in the motion for a new trial proceedings, the defense hired a
     certified forensic pathologist, Dr. Paul W. Herrmann, to render an opinion concerning the time of
24   death of the victim, Kyle Smelser.  Dr. Herrmann stated in his declaration that had he been asked
     to testify, he would not have limited the time of death to a two-hour time period, but would have
25   testified that the time of death was sometime between 7:00 a.m. and 2:00 p.m. on February 26,
     2003.  (<u>See</u> Clerk's Tr. at p. 2014.)  Thus, Dr. Herrmann confirmed Dr. Rollins's findings that
26   the time of death could have occurred between 10:30 a.m. and 12:30 p.m. on February 26, 2003.

1    For all of the foregoing reasons, Petitioner failed to raise a "colorable" argument in Claim

2    I. Petitioner is not entitled to federal habeas relief on this Claim.

3        B.  Claim II

4    In Claim II, Petitioner argues that the imposition of his sentence of twenty-six years to

5    life imprisonment (twenty-five years to life for the first-degree murder plus one year of an

6    enhancement) violates the cruel and unusual punishment clause of the Eighth Amendment to the

7    United States Constitution as well as the cruel and unusual clause of Article I, section 17, of the

8    California Constitution.  At the outset, to the extent that Petitioner bases this Claim on the

9    California Constitution, it is not cognizable on federal habeas review.  See 28 U.S.C. § 2254(a);

10   Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("In conducing habeas review, a federal court is

11   limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

12   States.").

13   A criminal sentence that is not proportionate to the crime of conviction may indeed

14   violate the Eighth Amendment to the United States Constitution.  Outside of the capital

15   punishment context, however, the Eighth Amendment "'forbids only extreme sentences that are

16   grossly disproportionate to the crime.'"  United States v. Bland, 961 F.2d 123, 129 (9th Cir.

17   1992) (quoting Harmelin v. Michigan, 501 U.S. 957, 1010 (1991) (Kennedy, J., concurring)).

18   The threshold for an inference of gross disproportionality is high.  So long as the sentence does

19   not exceed statutory maximums, it will not be considered cruel and unusual punishment under

20   the Eighth Amendment.  See United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998);

21   United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).  The Ninth Circuit has

22   observed that "[u]nder Harmelin, it is clear that a mandatory life sentence for murder does not

23   constitute cruel and unusual punishment."  United States v. LaFleur, 971 F.2d 200, 211 (9th Cir.

24   1991).  The Supreme Court has noted that "[o]utside of the context of capital punishment,

25   successful challenges to the proportionality of particular sentences have been exceedingly rare."

26   Rummel v. Estelle, 445 U.S. 263, 272 (1980).  Furthermore, the Ninth Circuit has explained that

34

"while capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences.  Like any other prison sentence, it raises no inference of disproportionality when imposed on a murderer."  See Harris v. Wright, 93 F.3d 581, 585 (9th Cir. 1996) (internal citation omitted).

In this case, Petitioner was not even sentenced to a mandatory life sentence.  Instead, he was sentenced to twenty five years to life for the first degree murder conviction along with one year for the enhancement.  As Harris makes clear, the mere fact that Petitioner was only seventeen years old at the time does not affect the proportionality of this non-capital sentence for first degree murder.  Petitioner has failed to raise a "colorable" federal constitutional claim that his sentence was cruel and usual under the Eighth Amendment.  Therefore, he is not entitled to federal habeas relief on Claim II as he has not presented a "colorable" claim.

V.  REQUEST FOR AN EVIDENTIARY HEARING

In his traverse, Petitioner requests an evidentiary hearing.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted). To show that a claim is "colorable," a petitioner is "required to show facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons stated in supra Part IV.  Petitioner failed to demonstrate that he has a colorable claim for federal habeas relief.  Thus, his request will be denied.

VI.  CONCLUSION

For all of the foregoing reasons, IT IS HEREBY ORDERED that Petitioner's request for

35

an evidentiary hearing is DENIED.

Furthermore, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  March 7, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

36